1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HAPTIC, INC.,

 Plaintiff,

 v.

APPLE, INC.,

 Defendant.

Case No.  24-cv-02296-JSC

**CLAIM CONSTRUCTION ORDER**

Re: Dkt. Nos. 101, 119, 121

Haptic sues Apple for direct and indirect infringement of U.S. Patent No. 9,996,738 ("the '738 patent").  (Dkt. No. 1.)[1]  Before the Court is the parties' claim construction dispute over seven claim terms.  Having carefully considered the parties' briefing and evidence, and with the benefit of a December 6, 2024 *Markman* hearing, the Court construes the terms as set forth below.

**BACKGROUND**

The '738 Patent is titled "System and Method for Controlling a Terminal Device."  '738 patent, (54).  The Patent Abstract summarizes the patent as follows:

> A control system includes a housing engaged to a mounting surface, a sensor contained within the housing, a server in communication with the sensor, and a terminal device in communication with the server.  A gesture by a user associated with the mounting surface controls activity of the terminal device, such as a knock on a wall lowering a thermostat.  The control system enables a mounting surface independent from the terminal device to become a controller for the terminal device. …

*Id.* at (57).  Thus, when utilized, "[a]ny independent mounting surface can be converted into a controller for a terminal device."  *Id.* at 6:35-36.  And "[s]imple physical interactions on an

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    independent surface can now control the terminal device." *Id.* at 6:47-48. "Even more

2    particularly, the present invention relates to a system to detect gestures on a mounting surface and

3    to generate commands for the terminal device based on detected gestures." *Id.* at 1:45-48.

### LEGAL STANDARD

#### I.    Claim Construction Generally

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (cleaned up).

> Because the meaning of a claim term as understood by persons of skill
> in the art is often not immediately apparent, and because patentees
> frequently use terms idiosyncratically, the court looks to "those
> sources available to the public that show what a person of skill in the
> art would have understood disputed claim language to mean." Those
> sources include "the words of the claims themselves, the remainder
> of the specification, the prosecution history, and extrinsic evidence
> concerning relevant scientific principles, the meaning of technical
> terms, and the state of the art."

*Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems,*

*Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Claim terms are defined by their "ordinary and

customary meaning," which is "the meaning that the term would have to a person of ordinary skill

in the art in question at the time of the invention." *Id.* at 1312-13.  In ascertaining the ordinary

meaning of a term, courts first look to the patent's claim terms, specification, and prosecution

history, which is the patent's "intrinsic record." *Id.*  The claim language is "of primary

importance" when determining the bounds of the claimed invention and  "[t]he specification

necessarily informs the proper construction of the claims." *Id.* at 1316.  Extrinsic evidence may

elucidate relevant art, but such evidence is only considered within the context of intrinsic

evidence. *Id.* at 1317-19.  "Extrinsic evidence consists of all evidence external to the patent and

prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

### DISCUSSION

#### I.    Person of Ordinary Skill in the Art (POSITA)

The parties submit dueling definitions of a person of ordinary skill in the art ("POSITA").

United States District Court
Northern District of California

1    Haptic's expert, Dr. Cabric, opines a POSITA "would hold an undergraduate degree in electrical

2    engineering, computer science, or a related field, and have at least two years of practical

3    experience as an engineer, including experience with signal processing," and "[a]dditional

4    education in graduate school could substitute for practical experience, or significant practical

5    experience in the field could substitute for school education."  (Dkt. No. 119-3 ¶ 21.)  Apple's

6    expert, Dr. Visell, opines a POSITA "would have had a bachelor's degree in computer science,

7    computer engineering, or a related field, and two to three years of practical computer

8    programming or engineering experience, including experience developing interface technologies."

9    and "[a]dditional graduate education could substitute for professional experience, or significant

10    experience in the field could substitute for formal education."  (Dkt. No. 121-3 ¶ 33.)

Although these definitions substantially overlap, they differ in that Apple's definition

12    requires "experience developing interface technologies" and Haptic's definition requires

13    "experience as an engineer, including experience with signal processing."[2]  Haptic argues the

14    technology at issue "encompasses a broader range of technology than Apple's proposed 'user

15    interface technologies.'"  (Dkt. No. 119 at 8.)

The patent's technology involves interface technologies, as the invention creates an

17    interface to control another device, but the interface is a component of signal processes which

18    make the control possible.  As the patent specifies, "[t]he contact interaction generates the data

19    signals of the sensor through the transmission portion of the housing."  '738 patent, 4:65-66; *see

20    also*, *id.* at 6:53-60 ("Interfaces 99 are connected to the server 40 in order to interact with the

21    control system 10.  The interfaces 99 can include computers, laptops, tablets and smartphones.

22    FIG. 1 shows a variety of different interfaces 99.  The interfaces 99 allow the user to adjust the

23    settings of the control system 10.  Gestures by a user associated with the mounting surface 22

24    control the terminal device 50 in FIGS. 5 and 7-9.")  Thus, the initial interface technology is but

United States District Court<br>Northern District of California

---

[2] The definitions also differ in Haptic's contention that a POSITA would have a degree in
"electrical engineering," though this is likely included in Apple's contention that the POSITA
have a degree in "a related field."  Further, Apple in its Claim Construction brief does not contest
that a POSITA could not be a person with a bachelor's degree in electrical engineering.  (Dkt. No.
121 at 10-11.)

one aspect of the invention as a whole.  Further, the function of the technology involves signal processes that are necessary to the functioning of the invention as demonstrated by the diagram below:



*Id.* at fig. 2; *see id.* at 8:48-52 ("FIG. 2 is a flow diagram of an embodiment of the present invention, showing the data signals of the sensor 30 in relation to the server 40.  The contact interaction 60 generates the data signals 70 of the sensor 30 through the transmission portion 28 of the housing 20.").  Thus, while interface technology is one component of the invention, the patent's specification shows signal processes are key to the proper functioning of the invention.

As a result, the Court adopts the following definition of a POSITA: A POSITA would hold an undergraduate degree in electrical engineering, computer science, computer engineering, or a related field, and have at least two years of practical experience with computer programming or as an engineer, including experience with signal processing or developing interface technologies.

## II.    Term 1

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "said contact interaction | No construction necessary. | Where the contact interaction is a user impact (e.g., a knock) directly on the |

4

| being comprised of an impact on said mounting surface" | | mounting surface. |
|---|---|---|

Term 1 appears in claim 1 of the '738 patent which reads:

> A control system comprising:
>
> a housing having an engagement means for a mounting surface;
>
> a sensor contained within said housing, said sensor forming an interactive zone defined by a range of said sensor, said sensor being comprised of an accelerometer, said interactive zone being aligned with said mounting surface and overlaying said mounting surface outside a perimeter of said housing, said sensor being in a fixed position relative to said engagement means, wherein a contact interaction associated with said mounting surface within said interactive zone is detected by said sensor as data signals, **said contact interaction being comprised of an impact on said mounting surface**, said data signals being comprised of vibration data of said contact interaction; …

'738 patent,12:2-45 (emphasis added).  Apple argues the highlighted claim language requires a "direct" impact on the mounting surface and Haptic contends no construction is necessary.

The claim language itself does not include the word "direct."  And "directly" only appears in the specification when the patentee is distinguishing between direct and indirect physical impacts, both of which constitute impacts on the mounting surface.  *Id.* at 7:64-8:1; *id.* at 8:55-65. Further the term is comprised of "commonly understood words" that may be "readily apparent even to lay judges."  *Phillips*, 415 F.3d at 1314 (holding further "[i]n such circumstances, general purpose dictionaries may be helpful.").  The word "impact" does not mean only *direct* impact. Indeed, the definitions of "impact" Apple cites are not limited to a direct impact.  (Dkt. No.  121-9 at 4 ("the force or action of one object hitting another"); 121-6 at 4 ("The striking of one body against another; collision. … The force transmitted by a collision.").)

Additionally, if "preferred [] embodiment[s] in the specification would not fall within the scope of the patent claim, [s]uch an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support."  *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also In re Papst Licensing Digital Camera Patent Litigation*, 778 F.3d 1255,

United States District Court
Northern District of California

1270-71 (Fed. Cir. 2015) ("We do not generally construe the claims of a patent to exclude a preferred embodiment."); *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."); *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) (holding "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment"). The preferred embodiments in the '738 patent show contact interactions comprised of both direct and indirect impacts on the mounting surface.

Figure 5 illustrates a direct impact on the mounting surface:



'738 patent, fig. 5. Here, because the user knocks on the mounting surface itself, there is direct impact on the mounting surface. By contrast, Figure 9 demonstrates an indirect impact on the mounting surface:



'738 patent, fig. 9. There, "[t]he mounting surface 22 is ***within*** the table, and the tabletop is not the mounting surface 22. The contact interaction is associated with the mounting surface 22 and

6

the contact interaction is detected through the mounting surface 22*, even if the contact interaction is not always directly on the mounting surface* 22." *Id.* at 7:63-8:1 (emphasis added). Thus, the "contact interaction is transmitted *through* the mounting surface 22 to the sensor 30." *Id.* at 8:3-4 (emphasis added). So, the impact on the mounting surface is indirect. Apple's construction excludes this preferred embodiment.

Figures 7 and 8 further illustrate indirect impacts on the mounting surface. *See Id.* at fig. 7, 8. Figure 7 shows an embodiment where the impact is a knock on one side of a wall where the mounting surface is the other side of the wall. So, the impact is indirectly "transmitted to the mounting surface 22 and then to the sensor 30." *Id.* at 7:51-56. And Figure 8 shows the mounting surface as the bottom of a table where the user knocks on the top of the table. The impact here "is transmitted to the mounting surface 22 on the bottom of the table and to the sensor 30." *Id.* at 7:56-51. Just as Figure 9 illustrated, in these contact interactions, the impact "is transmitted *through the mounting surface*." *Id.* at 8:3-4 (emphasis added). All told, three of the five preferred embodiments of the '738 patent involving the disputed term would be excluded under Apple's construction, which "is rarely, if ever, correct." *Vitronics*, 90 F.3d at 1583.

Faced with excluding three of the five illustrated embodiments, Apple next contends the patent's prosecution history, specifically an amendment Haptic made to claim 1 to overcome a prior art rejection, supports a narrowed claim construction. A rejected draft of the '738 patent did not include "said contact interaction being comprised of an impact on said mounting surface." (Dkt. No. 121-10 at 134.) Haptic added the term in response to the claim examiner's rejection, when the examiner noted the patent claim as written would have been an obvious modification of prior art patents. (*Id.* at 104-105.) The examiner specifically cited the Zimmerman patent, which disclosed a contact interaction detected by a sensor when a user "comes within range of the photoelectric proximity switch panel." (Dkt. No. 121-10 at 104-05.) The Zimmerman patent's sensor did not necessitate physical contact with anything to activate the sensor, as that patent disclosed, "[d]etecting finger proximity through one or more glass panes that might include air gaps." U.S. Patent No. 5,103,085, 1:55-56 (filed Sept. 5, 1990). In explaining its amendment to claim 1, Haptic noted one of its claim revisions included "a contact interaction as physical impact

7

on the mounting surface." (Dkt. No. 121-10 at 143.)  Further, Haptic distinguished the claim by noting "[t]here is no suggestion, motivation, or teaching for the transmission portion of the engagement means and relationship of the sensor relative to the mounting surface set by the transmission portion."  (*Id.* at 143-44.)  And Haptic reiterated the claim included "a contact interaction as physical impact on the mounting surface."  (*Id.* at 143-44.)

Haptic's amendment during prosecution of its patent is not a "clear and unmistakable" disavowal of the claim language's plain meaning.  *See 3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013); *see also Phillips*, 415 F.3d at 1317 ("because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").  The amendment differentiates between physical and non-physical contact interactions, not direct and indirect impacts.  Apple has not identified highly persuasive evidentiary support for excluding preferred embodiments.

A court may properly determine a claim term need not be construed because the term has a plain meaning from the intrinsic record.  *See O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  But "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."  *Id.* at 1360.  Thus, a "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *Id.* at 1361.  Here, if the Court does not construe "impact" or merely states the term has a plain and ordinary meaning, the proper scope of the claim term, that is, whether indirect impacts are within the claimed invention, would improperly go to the jury.  Therefore, the Court must construe the term to resolve this dispute.

So, the Court construes "impact" to mean direct or indirect impact.

//

//

**III.    Term 2**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "terminal device" | No construction necessary. | A remote device. |

"[T]erminal device" appears in the independent claim 1 and dependent claims 8-13.  In claim 1, it appears as "a **terminal device** being comprised of a receiving module and means for initiating activity of said **terminal device** corresponding to said command, said **terminal device** being in communication with said server, said output module transmitting said command to said receiving module."  '738 patent, 12:29-34 (emphasis added).  And in claim 8, for example, the term is further used: "The control system, according to claim 1, wherein said **terminal device** is comprised of one device selected from a group consisting of: a television, a thermostat, a computer, a software system, a game console, a fan, a mattress adjustor, an alarm clock, and a lighting fixture."  *Id.* at 13:21-25 (emphasis added).   The parties dispute whether the terminal device must be a remote device, that is, physically separate from the server.

The ordinary meaning of a claim term is not determined in a vacuum, but "in the context of the written description."  *Phillips*, 415 F.3d at 1313.  The specification teaches the terminal device is the device being controlled.  The title of the patent is "System and Method for Controlling a Terminal Device."  '738 patent, (54).  The patent's background describes it as a system "on an exterior mounting surface independent from the terminal device to be controlled."  *Id.* at 1:42-45.  In the specification, the patentee clarifies the invention converts mounting surfaces "into a controller for a terminal device."  *Id.* at 6:35-36.  The word "control" or "controls" appears regularly in relation to the terminal device.  *See, e.g.*, *id.* at 5:56-58 ("Embodiments of the present invention further include a method of *controlling a terminal device* with the system of the present invention.") (emphasis added); *id.* at 6:47-48 ("Simple physical interactions on an independent surface can now *control the terminal device*.") (emphasis added); *id.* at 6:58-60 ("Gestures by a user associated with the mounting surface 22 *control the terminal device* …") (emphasis added); *id.* at 10:45-46 ("Embodiments of the present invention include the method of *controlling a terminal device* …") (emphasis added).  Claim 10 further specifies the "method of controlling a terminal device" and claims 11, 12, and 13 use the same language.  Based on the patent's

language, terminal device has a plain meaning as "the device being controlled."

Apple nonetheless contends the plain and ordinary meaning of "terminal device" is a remote device. To support its construction, Apple primarily relies on extrinsic evidence, namely, its expert's testimony and dictionary definitions. While intrinsic evidence, such as the patent's specification, is "the single best guide to the meaning of a disputed term," *Vitronics*, 90 F.3d at 1582, courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony in constructing claim terms. *Phillips*, 415 F.3d at 1317-18. However, extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (cleaned up).

Apple's expert, Dr. Visell, opines the term's ordinary meaning is a "remote device." (Dkt. No. 121-3 ¶ 55.) He explains: "a POSITA would have understood the 'terminal device' is in communication with the 'server' and that the 'server' transmits the user command to the 'terminal device.'" (*Id.*) And he cites to instances in the patent's specification where the mounting surface is described as "physically separate" or where the patentee includes examples of remote-control devices. (*Id.* ¶¶ 56.) Haptic's expert, Dr. Cabric, by contrast, attests "terminal device" means "a device at an endpoint." (Dkt. No. 119-3 ¶¶ 35-39.) Dr. Cabric also highlights the phrase "remote terminal unit," which she opines is widely used in the art, noting that "terminal" cannot mean "remote" without causing redundancy. (*Id.* ¶ 43.) The Court finds Dr. Cabric's opinion more credible. As she explains, Dr. Visell's conclusion that the fact that the server communicates with the terminal device means the terminal device is separate from the server, "improperly equates *communicating with* a server with being *a remote device separate from* the server." (*Id.* ¶ 45.)

Apple further highlights two dictionaries, relied upon by Dr. Visell, that describe devices that are necessarily "at a distance" or "a remote site." (Dkt. No. 121 at 19 (quoting 121-3 at 330, 335).) While these dictionaries may be helpful in determining the correct construction of the claim term, they are not more persuasive than the patent's own language. *Phillips*, 415 F.3d at 1317. And Apple does not explain why these dictionaries are particularly applicable to this claim term, especially in light of the way the term is used in the patent. As the Federal Circuit has reiterated, the Court must construe the term "in the context of the written description.*" Id.* at

United States District Court
Northern District of California

1313.  As explained above, the term's meaning in the context of the patent's specification, embodiments, and claims is not a "remote device."

Apple finally argues "terminal device" is used to describe a device that is independent from the mounting surface.  The abstract describes "[t]he control system enables a mounting surface *independent from* the terminal device to become a controller for the terminal device." '738 patent, (57); *see also id.* at 4:31-36 ("Embodiments of the control system of the present intention convert any independent mounting surface into a controller for a terminal device.  A physically separate mounting surface … can be used to activate and deactivate a television or light fixtures, without the user touching either appliance."); *id.* at 6:35-38 ("Any independent mounting surface can be converted into a controller for a terminal device.  Simple gestures associated with the mounting surface can be used to control the terminal device in a different location."); *id.* at 5:39-55 (describing different examples of potential mounting surfaces and terminal devices where most of the described mounting surfaces are independent or remote from the terminal device).

But "independent from" does not necessarily mean "remote," that is, physically separate.  Indeed, one of the potential terminal devices described in claim 8 is a "software system," which need not be remote from the server it controls though it may be independent from it.  *Id.* at 13:21-25.  Further, the patent variously describes "remote control devices" at distinct points, but does not use the word "remote" when it describes the terminal device.  *Id.* at 2:7-8, 2:26-31, 3:26-29, 11:34-38.  Instead, the "terminal device" is regularly paired and modified by the word "control." *Id.* at 1:44-48 ("terminal device to be controlled); 4:1-4 ("It is another object of the present invention to provide an embodiment of the system for controlling a terminal device"); 6:3-6 ("The gesture related to the mounting surface controls the terminal device"); 14:27-33 ("The method of controlling the terminal device, …").  The intrinsic evidence therefore demonstrates the correct construction of the term.

Though the plain meaning of "terminal device" should apply, the parties' dispute goes to the scope of the claim, namely whether non-remote terminal devices are claimed by the patent.  So, the Court must construe the term.  *O2 Micro Intern.*, 521 F.3d at 1360.  At the *Markman* hearing, the parties agreed the term necessarily refers to the device that is being controlled.  (Dkt.

United States District Court
Northern District of California

1   No. 131 at 44:21-45:3.)  This construction is supported by the patent's intrinsic record as

2   demonstrated above.  The Court therefore construes the term to mean "the device being

3   controlled."

4   **IV.    The "Module" terms**

5        The parties disagree as to whether § 112(f) applies to the four "module" terms:

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **3-** "processing module . . . said processing module determining a data pattern corresponding to said data signals of said contact interaction and matching said data pattern with a gesture profile" | No construction necessary. | Subject to 35 U.S.C. § 112(f), Indefinite<br><br>Functions:<br>• Processing<br>• Determining a data pattern corresponding to the data signals<br>• Matching the data pattern with a gesture profile<br><br>Structure:<br>• Processing module 46<br>• Equivalents thereof |
| **4-** "[additional] receiving module" | No construction necessary. | Subject to 35 U.S.C. § 112(f), Indefinite<br><br>Functions:<br>• Receiving<br><br>Structure:<br>• Receiving module 52<br>Equivalents thereof |
| **5-** "routing module . . . said routing module receiving said data signals from said sensor" | No construction necessary. | Subject to 35 U.S.C. § 112(f), Indefinite<br><br>Functions:<br>• Routing<br>• Receiving the data signals from the sensor<br><br>Structure:<br>• Routing module 44 |

| | | Equivalents thereof |
|---|---|---|
| **6-** "output module . . . said output module transmitting said command to said receiving module" | No construction necessary. | Subject to 35 U.S.C. § 112(f), Indefinite<br><br>Functions:<br>• Outputting<br>• Transmitting the command to said receiving module<br><br>Structure:<br>• Output module 48<br>Equivalents thereof |

Under § 112(f), a patentee may "express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015); 35 U.S.C. § 112(f). Such claim limitations require what courts have dubbed the "means-plus-function" analysis. *Id.* In constructing claims potentially falling under § 112(f), a court must answer two questions; "First: Is the disputed claim limitation drafted in means-plus-function format? Second, if and only if the answer to the first question is 'yes': What, if any, is the structure corresponding to the claimed function?" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022) (citing *Williamson*, 792 F.3d at 1349, 1351).

A claim element using the word "means" "creates a rebuttable presumption that [§ 112(f)] applies." *Williamson*, 792 F.3d at 1348. Conversely, when a claim element does not use the word "means," there is a rebuttable presumption against application of § 112(f). *Id.* at 1348. But that presumption can be overcome "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1380 (Fed. Cir. 2022) (quoting *Williamson*, 792 F.3d at 1349).

Because none of the module terms use the word "means," there is a rebuttable presumption against application of § 112(f). *Williamson*, 792 F.3d at 1348. Apple therefore has the burden, in seeking § 112(f) construction, to demonstrate the terms "fail[] to recite sufficiently definite structure or else recite[] function without reciting sufficient structure for performing that

1    function." *Id.*

2        **a. Term 3: "processing module"**

3    Term 3 appears in claims 1, 6, 10, and 12.  Claim 1 reads:

4        A control system comprising:

5        [ … ]

6        a server in communication with said sensor, said server being
7        comprised of a routing module, a **processing module** being
        connected to said routing module, and an output module connected to
8        said processing module, said routing module receiving said data
        signals from said sensor, **said processing module determining a**
9        **data pattern corresponding to said data signals of said contact**
        **interaction and matching said data pattern with a gesture profile,**
        **said gesture profile** being associated with a command;

10

11   '738 patent, 12:2-45 (emphasis added).  Apple argues this term is both indefinite and subject to §

12   112(f) because it is a functional term that fails to allege sufficient structure.

13       The "processing module" term sets forth sufficient structure to be understood by a

14   POSITA "to have a sufficiently definite meaning as the name for structure."  *Williamson*, 792 F.3d

15   at 1349.  "There is no categorical rule that 'processor' is or is not structural," and as such, the

16   Court looks "to the case-specific record here to determine whether the phrase … is 'understood by

17   persons of ordinary skill in the art to have a sufficiently definite meaning as the name for

18   structure.'"  *WSOU Investments LLC v. Google LLC*, 2022-1064, 2023 WL 6531525, *4 (Fed. Cir.

19   Oct. 6, 2023) (quoting *Williamson*, 792 F.3d at 1349).  Here, the processing module is described

20   by its location and relationship to the other components of the server.  '738 patent, 5:25-27

21   (describing a "processing module" as "being connected to the routing module," and "an output

22   module."); *id.* at 13:56-14:3 ("said server being comprised of a routing module, a processing

23   module being connected to said routing module, and an output module connected to said

24   processing module.").  And the patent also outlines how the processing module performs its

25   function: "[T]he processing module determines the data pattern corresponding to the data signals

26   of the contact interaction … [and] matches the data patterns with a gesture profile."  *Id.* at 5:30-35.

27   So, the claim describes sufficient structure to defeat rebuttal of the presumption against means-

28   plus-function analysis.  *See Samsung Elec. Am., Inc. v. Prisua Engineering Corp.*, 948 F.3d 1342,

United States District Court
Northern District of California

1353-54 (Fed. Cir. 2020) (holding that claim language requiring the "digital processing unit" be connected to a "data entry device" "constitutes further evidence of the structural nature of "digital processing unit"); *see also Finjan v. Proofpoint, Inc.*, 13-cv-05808-HSG, 2015 WL 7770208, at *10-11 (N.D. Cal. Dec. 3, 2015) (applying *Williamson* and concluding the term "content processor" was not a means-plus-function limitation because the patent specified "how the 'content processor' interacts with the invention's other components (the transmitter and receiver), which informs the term's structural character.").

Further, the patent specification also describes the process by which the processing module matches the data pattern with a gesture profile:



*Id.* at fig. 2. Through reference to the manner in which the "processing module" is connected to the other components of the server, and how it interacts and connects with the routing module and output module, a POSITA would understand the term "to have a sufficiently definite meaning as the name for structure," and the term is therefore not written in means-plus-function format. *WSOU*, 2023 WL 6531525, at *4.

Apple's reliance on Dr. Visell is unpersuasive. Dr. Visell opines "[a]lthough a general-purpose processor is a known structure, it is not sufficient structure because it is not capable of performing the functions recited (such as 'determining a data pattern corresponding to the data signals' and 'matching the data pattern with a gesture profile') without programming." (Dkt. No. 121-3 ¶ 66.) But Dr. Cabric counters, "the processing module does exactly what the claim says it

does, i.e., as part of a server, it is connected to a routing module, processes data signals from a routing module, determines a data pattern, and matches a data pattern with a gesture profile associated with a command," and that this specificity and connectivity, connotes a specific structure.  (Dkt. No. 119-3, ¶¶ 54, 57.)  The Court finds Dr. Cabric more credible.

Finally, citing *Williamson*, Apple argues "processing module" and the remaining module terms are necessarily means-plus terms because "module" is a nonce word that can substitute for "means."  In *Williamson*, the Federal Circuit concluded "module" as part of the term "distributed learning control module "is a well-known nonce word that *can* operate as a substitute for 'means.'"  *Williamson*, 792 F.3d at 1350 (emphasis added).  However, the words preceding "module"—"distributed learning control"—did not give or refer to any structure and the patent did not "describe how the [claim term] interacts with other components in the distributed learning control server in a way that might inform the structure to the [claim term] as recited in the claim."  *Williamson*, 792 F.3d at 1350-51.  And "[e]ven if a patentee elects to use a 'generic' claim term, such as a 'nonce word or a verbal construct,' properly construing that term (in view of the specification, prosecution history, etc.) may still provide sufficient structure such that the presumption against means-plus function claiming remains intact."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014) (cleaned up) overruled on other grounds by *Williamson*, 792 F.3d at 1349.[3]  So, "[s]tructure may also be provided by describing the claim limitation's operation, such as its input, output, or connections."  *Id.*  The claim term here, as explained above, not only indicates structure with the prefix "processing," but also describes the term in both the specification and claims by reference to its "input, output, or connections."  *Id.*  The mere use of the word "module" does not transform the term into a means-plus term.

So, the Court finds "processing module" is governed by its plain and ordinary meaning. Since Apple did not offer an alternative construction, Apple has waived its ability to do so.  The term need not be construed.

//

---

[3] The *Williamson* court only overruled *Motorola's* holding that there is a "strong" presumption against means-plus function language absent the word "means".  *Id.*

United States District Court
Northern District of California

**b. Term 4: Receiving Module**

The term "receiving module" appears in claims 1, 9, and 10: (1) in claim 1: "a terminal device being comprised of a **receiving module** and means for initiating activity of said terminal device being in communication with said server, said output module transmitting said command to said **receiving module;**" (2) further, in claim 9: "The control system, according to claim 1, further comprising: an additional terminal device being comprised of an **additional receiving module** and additional means for initiating activity of said additional terminal device corresponding to an additional command, said additional terminal device being in communication with said server, said output module transmitting said additional command to said **additional receiving module**;" (3) and finally, in claim 10: "A method of controlling a terminal device, the method comprising the steps of: … connecting a terminal device in communication with said server, said terminal device being comprised of a **receiving module**; making physical impact on said mounting surface so as to generate a contact interaction; detecting said contact interaction as data signals with said sensor, … transmitting said command to said **receiving module** of terminal device with said output module of said server, said command corresponding to activity of said terminal device; and performing said activity with said terminal device." '738 patent, 12:2-45, 13:26-33, 13:27-14:27.

As described in the patent's specification, the receiving module is a component of the "terminal device" which is "in communication with the server [and] receives the command." *Id.* at 5:51-53. This language provides a POSITA sufficient meaning as the name for structure. *See Samsung*, 948 F.3d at 1354; *see also EnOcean GmbH v. Face Intern. Corp.*, 742 F.3d 955, 959 (Fed. Cir. 2014) (citing *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998)) (holding the term "receiver" "connotes sufficiently definite structure to those of skill in the art."); (Dkt. No. 119-3 ¶ 76). And while Dr. Visell opines this structure is insufficient because it is too broad (Dkt. No. 121-3 ¶¶ 84-85), the Federal Circuit has held, "just because 'the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art.'" *EnOcean*, 742 F.3d at 960 (quoting *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004)). The Court does not find Dr. Visell credible on this point.

The Court finds "receiving module" does not invoke § 112(f) and is defined by its plain meaning. Further, since the parties do not disagree as to the scope of the term, the Court need not construe the term.

### c. Term 5: Routing Module

Term 5 appears in claims 1, 10, and 12. Claim 1 reads:

> A control system comprising:
>
> […]
>
> a server in communication with said sensor, said server being comprised of a **routing module**, a processing module being connected to said **routing module**, and an output module connected to said processing module, **said routing module receiving said data signals from said sensor**, said processing module determining a data pattern corresponding to said data signals of said contact interaction and matching said data pattern with a gesture profile, said gesture profile being associated with a command;

'738 patent, 12:2-45 (emphasis added).

The routing module is another component of the server: "The server can be comprised of a routing module, a processing module being connected to the routing module … [t]he routing module receives the data signals from the sensor, and the processing module determines the data pattern corresponding to the data signals of the contact interaction." *Id.* at 5:25-31. Figure 1 shows the server, where the routing module 44 can be seen:



United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.* at fig. 1.  "The data signals [] are received with the routing module 44 of the server 40 and the processing module 46 determines a data pattern 80 corresponding to the data signals 70 of the contact interaction 60."  *Id.* at 10:64-67.  Just like the other module terms before it, "routing module" therefore is understood "as a reference to a structure [], not simply any device that can perform a particular function" and is described by the components that are "operably connected to" it.  *Samsung*, 948 F.3d at 1354.  Based on this intrinsic evidence, the Court agrees with Haptic that a POSITA would understand "routing module" to be synonymous with "router" and "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Williamson*, 792 F.3d at 1349.

Apple argues the term is a means-plus-function term and is indefinite because the term is defined by the function it performs, i.e., routing.  (Dkt. No. 121 at 30-31.)  However, a POSITA would understand "routing module" to refer to a definite structure—a router.  Apple highlights Figure 1 where the word "router" is used to describe router 42, which is a separate device from the server claimed in the patent.  That "router" is used once outside of the claimed server, however, does not lead to the inference that "routing module" is either indefinite or a means-plus-function term.  Instead, the reference to "router 42" as a structure indicates a "routing module" has a definite structure.

Section 112(f) does not apply to "routing module" and its plain meaning governs.

### d. Term 6: Output Module

Term 6 appears in claims 1, 9, and 10. Claim 1 reads:

> A control system comprising:
>
> [ … ]
>
> a server in communication with said sensor, said server being comprised of a routing module, a processing module being connected to said routing module, and an **output module** connected to said processing module, said routing module receiving said data signals from said sensor, said processing module determining a data pattern corresponding to said data signals of said contact interaction and matching said data pattern with a gesture profile, said gesture profile being associated with a command; and
>
> a terminal device being comprised of a receiving module and means for initiating activity of said terminal device corresponding to said

command, said terminal device being in communication with said server, **said output module transmitting said command to said receiving module**,

'738 patent, 12:2-45 (emphasis added).

An "output module" is a component of the server, as are the processing module and routing module. In Figure 1, the output module 48 is connected to the processing module. *Id.* at fig. 1. Further, "the output module transmits the command to the terminal device." *Id.* at 5:36-38. The patent specification goes on to describe, "[t]he method includes transmitting the command to the receiving module 52 of the terminal device 50 with the output module 48 of the server 40." *Id.* at 11:6-9. Just as with the other module terms before it, the patent specifies the location of the output module, its relationship to and interconnectivity with the other components of the server, and how the component performs its particular function. The claimed term is a component of the server that is "connected to said processing module" which "transmit[s] said command to said receiving module." *Id.* at 12:22-34. The patent thus claims the location of the output module as well as its function and describes how it interacts with the different components of the server and the terminal device. Therefore, the term can be "'understood by a person of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.'" *WSOU*, 2023 WL 6531525, at *4 (quoting *Williamson*, 792 F.3d at 1349); (Dkt. No. 119-3 ¶¶ 96-97).

Dr. Visell's opinion "a POSITA would have understood that a module in a server for outputting a command to a terminal device could have been implemented in any number of unique ways" and that the term "only [] identif[ies] a generic component of a cloud server that transmits the command to the receiving module" (Dkt. No. 121-3 ¶¶ 105, 106), fails to persuade that means-plus analysis applies. The term is limited to structures that are within the particular location described and can perform the claimed functions and interact with both the server and the terminal device in the claimed ways. The Court finds Dr. Cabric more credible as to this term.

The Court therefore finds the term "output module" is not a means-plus term and need not be construed as its plain meaning governs.

**V.    Term 7:**

United States District Court
Northern District of California

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "engagement means . . . wherein said engagement means of said housing comprises: an attachment means between said housing to said mounting surface; and a transmission portion connecting said sensor to said attachment means of said housing and being comprised of a material with flexibility different than said mounting surface so as to set a rigid position of said sensor relative to said mounting surface, said contact interaction generating said data signals of said sensor through said transmission portion" | Functions:<br>• Engagement<br>• Attaching or holding the housing to the mounting surface<br>• Transmitting data signals to the sensor<br>• Connecting the sensor of said attachment means of said housing to set a rigid position of said sensor relative to said mounting surface[4]<br><br>Structures:<br>• Adhesive, mechanical fasteners, or threaded screws<br>• Transmission portion 28 being comprised of a material with flexibility different than said mounting surface, which comprises **one or more of: (1) Frames and brackets 38, (2) a rigid material such as an injection molded frame, or (3) a spring loaded portion**<br>• Equivalents thereof[5] | Functions:<br>• Engagement<br>• Attaching or holding the housing to the mounting surface<br>• Transmitting data signals **from the attachment means** to the sensor<br>• Connecting said sensor to said attachment means of said housing to set a rigid position of said sensor relative to said mounting surface<br><br>Structure:<br>• Adhesive, mechanical fasteners, or threaded screws<br>• Transmission portion **28, which includes frames and brackets 38, an injected molded frame comprising a rigid material, or a spring loaded portion, each of which are** comprised of a material with flexibility different than the mounting surface **and reduce damping**<br>• Equivalents thereof |

---

[4] Haptic's construction as to the function varied slightly from what it is now. In its Reply brief, Haptic added "said attachment means of said housing" to reduce the matters at issue in the present case. (Dkt. No. 125 at 11.) Further, Apple construed the term to require more specificity as to the components, namely by specifying "transmission portion 28" and "frames and brackets 38." (Dkt. No. 121 at 25.) Haptic does not address this argument, but instead edited its construction to align with Apple's in this regard. (Dkt. No. 125 at 11.) The Court accepts Haptic's new language as to the function of the term and considers these constructions uncontested.

[5] Haptic offered a different construction in its opening claim construction statement than it did in

Term 7 appears in claims 1 and 6.  Claim 1 of the '738 patent reads:

A control system comprising:

a housing having an **engagement means** for a mounting surface;

[ … ]

**wherein said engagement means of said housing comprises:**

**an attachment means between said housing to said mounting surface; and**

**a transmission portion connecting said sensor to said attachment means of said housing and being comprised of a material with flexibility different than said mounting surface so as to set a rigid position of said sensor relative to said mounting surface, said contact interaction generating said data signals of said sensor through said transmission portion.**

'738 patent, 12:2-45 (emphasis added).

As a preliminary matter, the parties agree the claim term is subject to § 112(f) and thus agree to a means-plus construction.  (Dkt. No. 101 at 8-10; *see also Williamson*, 792 F.3d at 1349 ("'use of the word 'means' creates a presumption that § 112, ¶ 6 applies.'") (quoting *Personalized Media*, 161 F.3d at 703).)  "Construing a means-plus-function claim term is a two-step process." *Williamson*, 792 F.3d at 1351.  The Court first must "identify the claimed function" and then "determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012)).  When, as here, the term claims multiple functions, "the patentee must disclose adequate corresponding structure to perform all of the claimed functions." *Id.* at 1351-52 (citations omitted).

The Court focuses on the portions of the construction at issue which are bolded and underlined in the table above.

---

the parties' original joint claim construction statement.  (*Compare* Dkt. No. 101 at 8-10; *with* Dkt. No. 119 at 25-26.)  Apple objects insofar as Haptic adds "a rigid material such as an injection molded frame" to its construction, arguing it is prejudiced by this insertion because it did not have the opportunity to conduct discovery.  But it still provides a construction that accounts for Haptic's later addition.  Because Apple provided an alternative construction in response to Haptic's construction, does not identify any needed discovery, and was able to respond both in its briefing and at the *Markman* hearing, the Court considers Haptic's construction as proposed in its opening claim construction brief.

United States District Court
Northern District of California

**A.  Function**

The patent requires data signals be transmitted *through* the attachment means, but not *from* the attachment means.  Claim 1 discloses "a transmission portion connecting said sensor to said attachment means … said contact interaction generating said data signals of said sensor through said transmission portion."  '738 patent, 12:39-45.  The claim does not require the signals be transmitted *from* the attachment means to the sensor, but only that the attachment means is connected to the transmission portion and the sensor.  The patent's specification also does not require the data signals be transmitted from the attachment means to the sensor.  *See, e.g.*, *id.* at 8:9-12 ("The engagement means 24 of the housing 20 is cooperative with the sensor 30 so that any contact interaction generates data signals of the sensor through the transmission portion 28 of the engagement means 24.").

Apple argues that because the transmission portion connects the sensor to the attachment means, the transmission portion necessarily transmits data signals from the attachment means to the sensor.  (Dkt. No. 121 at 22.)  But the Court cannot import such a limitation into the claim when such limitation is not expressed in the claim.  *In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1367-68 (Fed. Cir. 2014) ("When construing functional claims under [§ 112(f)], the statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.") (internal quotation marks omitted) (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)).

The Court therefore adopts Haptic's construction of the claimed function.

**B.  Structure**

The parties dispute the necessary structure for the transmission portion of the engagement means.  Apple contends it must include "frames and brackets 38, an injected molded frame comprising a rigid material, or a spring loaded portion, each of which … reduce damping."  Haptic contends it comprises "one or more of: (1) frames and brackets, (2) rigid material such as an injection molded frame, or (3) a spring loaded portion."

**a.  Transmission Portion Components**

Claim 1 discloses the transmission portion is "comprised of a material with flexibility

different than said mounting surface so as to set a rigid position of said sensor relative to said mounting surface." '738 patent, 12:39-43.  The specification identifies three different materials for the transmission portion.  First, "[i]n some embodiments, the transmission portion has a spring loaded portion to reduce damping of the sensor within the housing." *Id.* at 4:49-51.  Second, it discloses: "In some embodiments, the transmission portion 28 can be comprised of frames and brackets 38 . . . ." *Id.* at 7:7-8.  Third, "[t]he transmission portion 28 can be comprised of a rigid material, such an[*sic*] injection molded frame with flexibility different than the materials of the mounting surface 22 or surface of the contact interaction." *Id.* at 8:20-23.

The specification and claims thus teach the proper structure includes a transmission portion with (1) frames and bracket, or (2) a spring loaded portion, or (3) or an injection molded frame. At the *Markman* hearing, Haptic conceded and Apple concurred that the proper construction for the injected molded frame is "an injection molded frame comprising a rigid material." (Dkt. No. 131 at 117:1-118:7.)  This construction tracks the language of the '738 patent's specification. *Id.* at 8:20-23.

So, the Court construes "transmission portion" to comprise one or more of: (1) frames and brackets 38, (2) an injection molded frame comprising a rigid material, or (3) a spring loaded portion.

### b. Flexibility

The parties also dispute whether the transmission portion is comprised of material with flexibility different than the mounting surface and comprises one the above materials, or whether the transmission portion includes the above materials, *each of which is* comprised of a material with flexibility different than the mounting surface.

The structure's flexibility arises three times in the patent.  In the specification, the patentee explains "[t]he transmission portion 28 can be comprised of a rigid material, such an[*sic*] injection molded frame *with flexibility different than the materials* of the mounting surface 22." *Id.* at 8:20-24 (emphasis added).  Claim 1 specifies, "a transmission portion connecting said sensor to said attachment means of said housing and *being comprised of a material with flexibility different* than said mounting surface." *Id.* at 12:39-42 (emphasis added).  And in claim 10, "a transmission

portion connecting said sensor to said attachment device of said housing *and being comprised of a material with flexibility different than said mounting surface*." *Id.* at 13:50-54 (emphasis added). The patent therefore discloses the transmission portion must be comprised of a material with flexibility different than the mounting surface.

Haptic's construction follows the patent's language, which does not require every component of the transmission portion be comprised of material which itself has a flexibility different than the mounting surface.  Apple's construction would improperly require all of the transmission portion's materials be of a flexibility different than the mounting surface.

So, the Court construes the transmission portion 28 be comprised of a material with flexibility different than said mounting surface.

### c. Reduce Damping

Finally, the parties disagree as to whether the engagement means includes a "reducing damping" limitation.

Claim 3 discloses "said transmission portion is comprised of a spring loaded portion so as to reduce damping of said contact interaction." '738 patent, 12:50-52.  The patent specification also states the purpose of the spring loaded portion in some embodiments of the transmission portion is "to reduce damping of the sensor within the housing." *Id.* at 4:49-51.  The same is said of the frames and brackets 38.  *Id.* at 7:7-9 ("In some embodiments, the transmission portion 28 can be comprised of frames and brackets 38 or a spring loaded portion (not shown) so as to reduce damping.").  And the patent teaches "[t]he transmission portion 28 affects sound or vibration or other stimuli from the mounting surface 22 to the sensor 30." *Id.* at 7:15-17.  So, reduction of damping allows the sensor to "more accurately detect[] the mounting surface." *Id.* at 7:13-15. Further, the parties agree one of the functions of the engagement means is to transmit data signals to the sensor, and reduction of damping is key to this process.  *See e.g.*, *id.* ("The engagement means 24 attaches the sensor 30 and reduces damping so that sensor 30 more accurately detects the mounting surface.").  And, the patent history shows Haptic intended to distinguish prior art by highlighting how its invention would reduce damping.  (*See* Dkt. No. 121-10 at 144 ("The generic attachment means of the Marks publication is silent on dampening vibrations, and there is no

teaching for why dampening would be a concern.").)  The intrinsic record therefore supports the conclusion the transmission portion must be comprised of structure that reduces damping to perform its claimed function.  *Williamson*, 792 F.3d at 1351.

Haptic counters the patent does not require a transmission portion comprising an injection molded frame to similarly reduce damping and therefore it is improper to import a "damping" limitation into the engagement means.  '738 patent, 8:20-25 ("The transmission portion 28 can be comprised of a rigid material, such an [sic] injection molded frame with flexibility different than the materials of the mounting surface 22 . . . .").  However, the immediately preceding sentence states "[t]he rigid position of the sensor 30 relative to the mounting surface reduces damping of the contact interaction through the transmission portion." *Id.* at 8:18-20.  So, the injection molded frame embodiment, like the other two, must reduce damping.

The claim term is therefore construed to include "reduce damping."

## CONCLUSION

Below are the claim terms as construed by the Court:

| No. | Claim Term | Court's Adopted Construction |
|---|---|---|
| 1. | "said contact interaction being comprised of an **impact** on said mounting surface" | An impact can be direct or indirect. |
| 2. | "**terminal device**" | The device being controlled |
| 3. | "**processing module** . . . said processing module determining a data pattern corresponding to said data signals of said contact interaction and matching said data pattern with a gesture profile" | No construction necessary. |
| 4. | "[additional] **receiving module**" | No construction necessary. |
| 5. | "**routing module** . . . said routing module receiving said data signals from said sensor" | No construction necessary. |
| 6. | "**output module** . . . said output module transmitting said command to said receiving module" | No construction necessary. |
| 7. | "**engagement means** . . . wherein said engagement means of said housing comprises: an attachment means between said housing to said mounting surface; and a transmission portion connecting said sensor to said attachment means of said housing and | Functions:<br>• Engagement<br>• Attaching or holding the housing to the mounting surface |

26

| | |
|---|---|
| being comprised of a material with flexibility different than said mounting surface so as to set a rigid position of said sensor relative to said mounting surface, said contact interaction generating said data signals of said sensor through said transmission portion" | • Transmitting data signals to the sensor<br>• Connecting the sensor of said attachment means of said housing to set a rigid position of said sensor relative to said mounting surface<br><br>Structures:<br>• Adhesive, mechanical fasteners, or threaded screws<br>• Transmission portion 28 being comprised of a material with flexibility different than said mounting surface and which reduce damping, which comprises one or more of: (1) frames and brackets 38, (2) an injection molded frame comprising a rigid material, or (3) a spring loaded portion<br>• Equivalents thereof |

The Court sets a further case management conference for February 20, 2025 at 1:30 p.m. An updated joint case management conference statement is due one week in advance.

This Order disposes of Docket Nos. 101, 119, and 121.

**IT IS SO ORDERED.**

Dated: January 13, 2025

*Jacqueline Scott Corley*

JACQUELINE SCOTT CORLEY
United States District Judge